ORIGINAL

CC: filed;
DKW;

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF HAWAII**

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

FEB 18 2026  LRK

at 1 o'clock and 20 min. P M
Lucy H. Carrillo, Clerk

NOMFUSI MOORE &
MICHAEL MOORE,
 *Plaintiffs,*

v.

BIG ISLAND FEDERAL
CREDIT UNION,
 *Defendant.*

Case No.: CV26  00077 DKW  RT

**DEMAND FOR JURY TRIAL**

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

### (1) VIOLATION OF THE FAIR CREDIT REPORTING ACT (15 U.S.C. § 1681s-2(b))

### (2) BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING (HAWAIʻI COMMON LAW)

### (3) VIOLATION OF 42 U.S.C. § 1981 (RACE DISCRIMINATION IN CONTRACTING)

### I. INTRODUCTION

**1.** This action arises from Defendant Big Island Federal Credit Union's ("BIFCU") willful furnishing and verification of inaccurate credit information to consumer reporting agencies, its undisclosed, punitive, and disproportionate account-servicing practices toward Plaintiffs, and its impairment of Plaintiffs' contractual rights under circumstances giving rise to an inference of race discrimination.

**2.** Despite Plaintiffs' ongoing payments on a $3,000 personal loan, BIFCU reported and then verified a materially inaccurate delinquency and past-due amount, directly damaging Plaintiffs' credit profiles and causing the denial of a mortgage application. BIFCU then continued to furnish compounding inaccuracies in subsequent reporting cycles.

**3.** In parallel, BIFCU employed undisclosed escalation practices—including automatic freezes of Plaintiffs' deposit accounts and debit cards after minor delinquencies—that contradicted the reasonable expectations created by the parties' written loan and account agreements.

## II. JURISDICTION AND VENUE

**4.** This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, and 42 U.S.C. § 1981.

**5.** The Court has supplemental jurisdiction over Plaintiffs' state-law claim pursuant to 28 U.S.C. § 1367.

**6.** Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides in this District and a substantial part of the events giving rise to the claims occurred in Hawai'i County.

## III. PARTIES

**7.** Plaintiff Nomfusi Moore is an individual residing in Hilo, Hawai'i and a member of BIFCU.

**8.** Plaintiff Michael Moore is an individual residing in Hilo, Hawai'i, a member of BIFCU, and the spouse of Nomfusi Moore.

**9.** Defendant Big Island Federal Credit Union is a federally chartered credit union with its principal place of business at 66 Lono Street, Hilo, Hawai'i 96720, and is a furnisher of information to consumer reporting agencies within the meaning of the FCRA.

## IV. FACTUAL ALLEGATIONS

**A. The Loan Relationship**

**10.** On or about April 29, 2025, Plaintiffs entered into a personal loan agreement with BIFCU (**Loan No. 53828**) in the principal amount of $3,000.

**11.** The Truth-in-Lending disclosures and Loan and Security Agreement provide for eleven (11) monthly payments of $264.00, beginning on or about May 29, 2025, followed by a final payment of $261.16 on or about April 29, 2026, at a fixed annual percentage rate of 10%.

**12.** The loan agreement specifies that a late charge may be imposed only when a payment is "21 or more days late," and that the late fee equals 20% of the interest due on the delinquent payment.

**13.** The Loan and Security Agreement states that BIFCU may enforce a statutory lien and apply funds in Plaintiffs' accounts "to what You owe when You are in default." The Member Service Agreement further provides that BIFCU "may" suspend a member's ability to conduct transactions when a loan is past due or the member is in default—framing this authority in discretionary terms throughout. Neither the Loan and Security Agreement nor the MSA discloses any automatic, system-driven policy that locks debit cards and restricts account access at a fixed ten-day delinquency threshold without individualized review or prior notice to the member.

**14.** Plaintiffs made regular payments on the loan during 2025 and remained in good standing through at least November 2025, with BIFCU's own records reflecting timely payments and an outstanding principal balance of approximately $1,561 by the end of that month.

**B. Undisclosed Automatic 10-Day Freeze Policy**

**15.** On multiple occasions in 2025, Plaintiffs experienced unexpected freezes of their BIFCU checking accounts and debit card access when a loan payment was only slightly delinquent.

**16.** Between the months of June and October 2025, after a missed payment after the due date, Plaintiffs' debit card was declined during routine transactions, and Plaintiffs discovered that their account access had been restricted.

**17.** In a recorded telephone call, a BIFCU employee explained to Plaintiff Nomfusi Moore that "when the loan is 10 days late, it automatically locks your debit card."

**18.** In the same call, the employee further stated that the system "does a back office lock where we can't even touch it," and "there's nothing that we can do about it," confirming that the freeze is an automatic, system-driven rule rather than an individualized use of discretion.

**19.** Ms. Moore explained during the call that on a prior occasion her checking account was not negative but her debit card was still frozen, preventing her from making a payment on the loan through BIFCU's online or card-based channels; the BIFCU employee did not dispute this and again attributed the restriction to the 10-day loan-delinquency lock.

**20.** As a result of this automatic freeze policy, Plaintiffs were repeatedly prevented from using ordinary electronic means to cure minor delinquencies and were forced to visit a BIFCU branch in person to access funds or make payments.

**C. Contract Documents Do Not Disclose the Automatic Freeze Policy**

**21.** The Member Service Agreement ("MSA") governing Plaintiffs' accounts grants BIFCU a security interest and lien that it may exercise "at our discretion" to "apply the funds" in an account to obligations owed when a member is in default. The MSA also provides that BIFCU "may" suspend a member's ability to conduct actions or transactions on "any or all accounts, products and services" when a loan is past due or the member is in default (MSA Provisions

5.d.1, 11.g, and 20). Each of these provisions uses permissive, discretionary language, indicating that BIFCU retains individualized judgment over whether and when to impose restrictions.

**22.** The MSA also lists various circumstances in which BIFCU may "suspend [a member's] ability to conduct actions or transactions" or "refuse an action or transaction," including when an account is overdrawn, a loan is past due, or the credit union believes an action may be fraudulent.

**23.** The MSA does not disclose any automatic, uniform policy that debit cards and accounts will be locked specifically when a loan becomes ten (10) days late, nor does it state that such a lock will occur without prior notice and will prevent members from making loan payments through normal electronic channels.

**24.** The loan agreement likewise does not disclose any ten-day automatic freeze policy or any practice of disabling debit cards before a payment is 21 days late, when late fees first become chargeable under its own terms.

**25.** In addition to reviewing the Loan and Security Agreement and the Member Service Agreement, Plaintiffs reviewed BIFCU's publicly available disclosures, including its Rate and Fee Disclosure and its Fee Schedule, both of which are incorporated into the Member Service Agreement. These documents list various account-related fees and conditions but do not reference any automatic freeze or debit-card lock tied to a ten-day loan-delinquency threshold.

**26.** Plaintiffs also reviewed BIFCU's Online Banking Terms and Conditions and related e-services disclosures, which govern electronic access to members' accounts. These documents describe BIFCU's right to refuse particular transactions or suspend services for security or account-status reasons but do not disclose any uniform, system-driven policy under which debit cards and account access are automatically locked when a loan becomes ten (10) days past due.

**27.** Nowhere in BIFCU's consumer-facing contracts or disclosures—including the Loan and Security Agreement, Member Service Agreement, Rate and Fee Disclosure, Fee Schedule, Online Banking Terms and Conditions, or other posted account disclosures—are members informed that a ten-day delinquency on a loan will trigger an automatic "back office" lock that front-line staff cannot override and that prevents members from accessing funds or making electronic payments to cure the delinquency.

**28.** Plaintiffs reasonably understood from these written agreements that: **(a)** significant consequences for late payment would arise at or after 21 days of delinquency, consistent with the late-charge threshold set forth in the loan agreement; **(b)** any suspension of account access would involve an exercise of individualized discretion by BIFCU, as indicated by the MSA's consistent use of permissive language ("may," "at our discretion"); and **(c)** no undisclosed automatic system would lock their accounts and debit cards at a fixed ten-day threshold without notice or opportunity to cure.

### D. Credit Reporting, Dispute, and Continued Inaccurate Furnishing

**29.** On or about January 2, 2026, BIFCU furnished data to consumer reporting agencies for Plaintiffs' loan account. As furnished to Experian, the data reflected that the account was "30 days past due" with a reported past-due balance of $527, even though the regularly scheduled monthly payment was approximately $264.

**30.** A TransUnion consumer disclosure for the Big Island FCU account (opened April 29, 2025 as a joint unsecured installment loan in the amount of $3,000 with a $264 monthly payment) shows that BIFCU reported a balance of $1,561 as of December 31, 2025, with "Pay Status: >Account 30 Days Past Due Date<," and a December 2025 payment-history line of balance

$1,561, past due $527, amount paid $0, scheduled payment $264, and a "30" rating, while all months from April through November 2025 are coded "OK" with $0 past due.

**31.** The information BIFCU furnished is internally inconsistent and misleading on its face: the month-by-month payment history it reported shows no past-due amounts or derogatory ratings through November 2025, yet BIFCU simultaneously reported that as of December 2025 the account was only "30 days past due" while carrying a past-due balance of $527—roughly twice the regular $264 installment. Specifically, if only the December 2025 payment was missed—as BIFCU's own month-by-month history indicates—the past-due balance should have been approximately $264 (one installment), not $527, which represents roughly two missed installments and is irreconcilable with BIFCU's simultaneously reported payment history showing all prior months as current with $0 past due.

**32.** BIFCU's credit reporting was also inconsistent across consumer reporting agencies. On or about January 14, 2026, a consumer credit report obtained through MyFICO—which aggregates data from all three major consumer reporting agencies—reflected that TransUnion's data for the BIFCU tradeline showed a worst delinquency status of "None Reported," while Experian's data for the same tradeline simultaneously reflected a "30 days past due" status with a $527 past-due amount. The fact that BIFCU's own furnished data produced materially different delinquency statuses at two consumer reporting agencies for the same account and same reporting period further demonstrates that the information BIFCU furnished and subsequently verified was inaccurate, incomplete, or both.

**33.** Plaintiffs made a payment on or about January 20, 2026 that covered the missed December installment.

**34.** In January 2026, Plaintiffs submitted a written dispute to Experian challenging both the accuracy of the "30 days past due" status and the inflated $527 past-due balance reflected on the BIFCU tradeline.

**35.** After receiving Plaintiffs' dispute, Experian notified Plaintiffs on or about January 20, 2026 that BIFCU had verified the disputed information as accurate and that no correction would be made to the tradeline.

**36.** By verifying the Experian tradeline as accurate despite the obvious discrepancy between a single missed $264 payment and a reported $527 past-due amount and "30 days past due" status, BIFCU failed to conduct a reasonable investigation and continued to furnish information that was inaccurate and misleading.

**37.** As a result of BIFCU's verification of this inaccurate information, both Plaintiffs' credit scores dropped by approximately 65 points, and on or about January 30, 2026, Plaintiffs were denied a mortgage application, with the lender specifically citing the BIFCU tradeline and the reported $527 past-due amount as a reason for denial.

**38.** Following BIFCU's verification of the December 2025 data as accurate, BIFCU continued to furnish data to consumer reporting agencies for Plaintiffs' account. Updated consumer disclosures obtained in late January and early February 2026 reveal that BIFCU reported a second consecutive month of delinquency for January 2026, with past-due amounts that are mathematically derived from the disputed and inaccurate December 2025 data.

**39.** A TransUnion consumer disclosure updated January 31, 2026, attached hereto as **Exhibit A**, reflects that BIFCU reported a January 2026 balance of $1,318, a past-due amount of $521, an amount paid of $270, a scheduled payment of $264, and a "30" delinquency rating for January

2026—the second consecutive "30" rating following December 2025. Notably, as of January 14, 2026—just seventeen days earlier—TransUnion's data for the same tradeline had reflected a worst delinquency status of "None Reported," as alleged in paragraph 32 above. By January 31, 2026, the tradeline reflected two consecutive "30" ratings for December 2025 and January 2026, indicating that BIFCU updated its furnished data to TransUnion during the very period in which it was on notice of Plaintiffs' dispute—and that the update made the tradeline more, not less, derogatory.

40. An Experian consumer disclosure generated February 7, 2026, attached hereto as **Exhibit B**, for the same BIFCU account reflects a balance of $1,318, a past-due amount of $521, a status of "Open. $521 past due as of Jan 2026," and "2 late payments," with "30" delinquency ratings for both December 2025 and January 2026. The Experian report confirms that BIFCU's furnishing of inaccurate past-due amounts has persisted across both reporting periods and both major consumer reporting agencies.

41. The $521 past-due amount reported for January 2026 is mathematically derived from the disputed $527 past-due amount that BIFCU verified for December 2025: $527 (disputed December past-due balance) + $264 (January 2026 scheduled installment) − $270 (payment received January 20, 2026) = $521. Because the $527 baseline was inaccurate—as demonstrated in paragraph 31 above, one missed $264 installment cannot produce a $527 past-due balance— the $521 figure calculated from it is also inaccurate. Had BIFCU corrected the December past-due amount to approximately $264 upon receiving notice of Plaintiffs' dispute, the January past-due amount following Plaintiffs' $270 payment would have been approximately $258, not $521—a difference of $263, or nearly one full additional installment that BIFCU's own payment history does not support.

42. BIFCU's continued furnishing of inaccurate data—including a second derogatory "30" rating for January 2026 calculated from a past-due amount inflated by the uncorrected December error—demonstrates that BIFCU's failure to conduct a reasonable investigation upon notice of Plaintiffs' dispute was not a one-time oversight but has produced compounding inaccuracies and cumulative harm to Plaintiffs' credit profiles with each successive reporting cycle. The January 2026 update to TransUnion, which transformed the tradeline from "None Reported" to two consecutive "30" ratings during the pendency of Plaintiffs' dispute, further evidences BIFCU's reckless disregard of its duties under the FCRA.

**E. Damages**

43. Following BIFCU's verification of the Experian tradeline as accurate, both Plaintiffs' credit scores dropped by approximately 65 points.

44. On or about January 30, 2026, Plaintiffs were denied a mortgage application; the lender identified their reduced credit scores and specifically referenced the BIFCU tradeline, including the $527 past-due amount, as a basis for denial.

45. BIFCU's automatic account freezes and debit card locks disrupted Plaintiffs' ordinary financial activities and caused loss of access to funds deposited in their personal accounts.

46. BIFCU also froze the deposit account maintained for Premier Events Hawaii LLC (BIFCU Account No. 50961006), a limited liability company that is a separate legal entity from the individual Plaintiffs.

47. The Premier Events Hawaii LLC account was not a party to, collateral for, or obligor on the personal loan (Loan No. 53828). At the time of loan origination, BIFCU itself established an

automatic transfer authorization directing that the monthly $264 loan payment be drawn from the Premier Events Hawaii LLC account.

**48.** By subsequently freezing the LLC's account under the same automatic 10-day delinquency lock applied to Plaintiffs' personal accounts, BIFCU disabled the very payment mechanism it had authorized, preventing the next scheduled loan payment from processing and ensuring further delinquency. The freezing of a separate legal entity's account—and the sabotage of BIFCU's own authorized payment arrangement—further demonstrates the indiscriminate, disproportionate, and self-defeating nature of BIFCU's automatic freeze policy, and caused Plaintiffs to suffer business disruption, reputational harm with vendors and business partners, and additional financial damages.

**49.** As a direct and proximate result of BIFCU's conduct, Plaintiffs suffered actual damages including credit score damage, loss of a housing opportunity, financial and business disruption, emotional distress, anxiety, and reputational harm. BIFCU's continued furnishing of inaccurate data for January 2026—adding a second derogatory rating and a new inflated past-due amount derived from the uncorrected December error—has compounded these injuries and continues to impair Plaintiffs' creditworthiness with each successive reporting cycle.

**F. Plaintiffs' Race and Circumstances Giving Rise to an Inference of Discriminatory Treatment**

**50.** Plaintiffs are Black. They reside in Hilo, Hawaiʻi, a community in Hawaiʻi County where Black or African American residents constitute approximately 0.7% of the population according to the U.S. Census Bureau's American Community Survey.

**51.** As set forth in paragraphs 23 through 27 above, none of BIFCU's consumer-facing contracts or disclosures—including the Loan and Security Agreement, Member Service Agreement, Rate and Fee Disclosure, Fee Schedule, Online Banking Terms and Conditions, or other posted account disclosures—inform members of any ten-day automatic lockout policy. The only description of this purported policy has come from oral statements by a BIFCU employee after Plaintiffs experienced account freezes, and BIFCU has never provided Plaintiffs with any written policy statement, internal memorandum, or system documentation confirming that such a rule exists or is uniformly applied to all members.

**52.** The treatment Plaintiffs received from BIFCU was unusual and disproportionately harsh in light of the circumstances: BIFCU imposed an undisclosed automatic lockout for a minor delinquency on a $3,000 personal loan; froze a separate LLC's business account that was unrelated to the loan; disabled the very automatic payment mechanism BIFCU itself had established to service the loan; refused to override the lock even when it prevented Plaintiffs from curing the delinquency; reported and verified inaccurate delinquency data to credit bureaus despite internal inconsistencies visible on the face of its own furnished data; and then continued to furnish compounding inaccuracies for a second consecutive month after being placed on notice of Plaintiffs' dispute. The cumulative severity of this treatment, in the absence of any documented policy justifying it, gives rise to an inference that BIFCU's conduct was motivated by factors other than legitimate business considerations.

**53.** Plaintiffs are informed and believe, and on that basis allege, that BIFCU does not uniformly impose the ten-day lockout rule described by its employee on all borrowers with comparable or greater delinquencies, and that the totality of BIFCU's treatment of Plaintiffs—including the undisclosed lockout, the freezing of a separate entity's account, the refusal to exercise discretion,

12

and the continued furnishing of inaccurate credit data after notice of dispute—was harsher than the treatment afforded to similarly situated non-Black members.

## V. COUNT I

### VIOLATION OF THE FAIR CREDIT REPORTING ACT

### (15 U.S.C. § 1681s-2(b))

**54.** Plaintiffs reallege and incorporate paragraphs 1–53.

**55.** BIFCU is a "furnisher of information" to consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2.

**56.** Upon receiving notice from Experian of Plaintiffs' dispute, BIFCU was obligated under 15 U.S.C. § 1681s-2(b)(1) to conduct a reasonable investigation of the disputed information, review all relevant information provided by Experian, report the results of its investigation to Experian, and, if the information was found to be inaccurate or incomplete, report the corrected information to all consumer reporting agencies to which it furnished the data.

**57.** BIFCU failed to conduct a reasonable investigation and instead verified information that was internally inconsistent and misleading, including reporting the account as "30 days past due" with a $527 past-due balance while simultaneously furnishing a month-by-month payment history that showed all months through November 2025 as "OK" with $0 past due and a regular installment of approximately $264.

**58.** A reasonable investigation, upon receiving Plaintiffs' dispute, would have compared the reported "30 days past due" status, the $527 past-due amount, and the payment-history grid

against BIFCU's own records and disclosed loan terms, and would have recognized that the reporting did not accurately or clearly reflect the age and amount of any alleged delinquency.

**59.** BIFCU's verification of the Experian tradeline was also unreasonable because, despite these discrepancies, BIFCU confirmed the information as accurate rather than correcting or clarifying the status and past-due amount after notice of dispute.

**60.** BIFCU's unreasonable verification has produced compounding harm: because BIFCU failed to correct the inaccurate $527 past-due amount for December 2025, that inflated figure became the baseline for January 2026 reporting, generating a new inaccurate past-due amount of $521, a second consecutive "30" delinquency rating, and an additional derogatory mark on Plaintiffs' credit profiles—all mathematically traceable to the December figure that BIFCU verified without reasonable investigation.

**61.** By verifying the inaccurate delinquency and inflated past-due amount after notice of dispute, and by continuing to furnish data derived from the uncorrected error in subsequent reporting cycles, BIFCU violated and continues to violate its duties under 15 U.S.C. § 1681s-2(b).

**62.** BIFCU's violations were willful and in reckless disregard of Plaintiffs' rights because: (a) the inconsistencies were obvious on the face of its own furnished data; (b) the data produced conflicting delinquency statuses across consumer reporting agencies; (c) BIFCU updated TransUnion's tradeline from "None Reported" to two consecutive "30" ratings during the very period it was on notice of Plaintiffs' dispute; and (d) BIFCU continued to calculate and furnish subsequent past-due amounts based on the disputed figure without correction.

**63.** Pursuant to 15 U.S.C. §§ 1681n and 1681o, Plaintiffs are entitled to recover actual damages, statutory damages, punitive damages, costs, and reasonable attorney's fees for BIFCU's violations of the FCRA.

## VI. COUNT II

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

## (HAWAI'I COMMON LAW)

**64.** Plaintiffs reallege and incorporate paragraphs 1–53.

**65.** Implied in Plaintiffs' loan and depository agreements with BIFCU is a covenant of good faith and fair dealing, requiring that contractual discretion be exercised honestly, fairly, and in a manner consistent with the reasonable expectations created by the parties' agreements.

**66.** The loan agreement's 21-day late-charge provision reasonably signals to borrowers that significant negative consequences for late payment will arise at or after 21 days of delinquency, not after a brief delay of only ten days.

**67.** While the MSA and Loan and Security Agreement grant BIFCU discretionary authority to suspend account access when a loan is past due—framing this authority in permissive terms ("may," "at our discretion") throughout—neither agreement discloses a rigid, automatic system rule that debit cards and account access will be locked at a fixed ten-day delinquency threshold without individualized review, prior notice, or an opportunity to cure, and that such locks will prevent borrowers from making loan payments through electronic channels.

**68.** BIFCU nonetheless implemented and enforced an automatic freeze policy under which "when the loan is 10 days late, it automatically locks your debit card," as a BIFCU employee admitted in a recorded telephone call with Ms. Moore.

**69.** In that call, the employee further explained that a "back office lock" occurs at ten days and that BIFCU staff "can't even touch it" and "there's nothing that we can do about it," confirming that BIFCU had converted its purported discretionary rights into a non-discretionary, undisclosed system rule.

**70.** This automatic 10-day lock repeatedly prevented Plaintiffs from using their debit card and online banking to make loan payments or conduct ordinary transactions, even when their checking account was not overdrawn, forcing them to cure alleged delinquencies only by appearing in person at a branch.

**71.** BIFCU also froze Plaintiffs' accounts without advance notice, such that Plaintiffs first learned of the restrictions only when their debit card was declined in the course of routine purchases.

**72.** By imposing undisclosed, automatic, and punitive account freezes—well before the 21-day late-fee threshold and without the individualized discretion contemplated by the MSA's permissive language—BIFCU exercised its contractual powers arbitrarily and unreasonably, frustrating Plaintiffs' justified expectations and depriving them of the benefits of their banking relationship. The freeze extended to the Premier Events Hawaii LLC business deposit account, which was unrelated to the personal loan obligation and belonged to a separate legal entity, and disabled the automatic payment transfer that BIFCU itself had established to service the loan— thereby ensuring that a brief delinquency would compound rather than self-correct.

16

**73.** BIFCU's conduct therefore constitutes a breach of the covenant of good faith and fair dealing under Hawaiʻi law.

**74.** As a direct and proximate result of this breach, Plaintiffs suffered financial harm, loss of access to funds, disruption of ordinary financial activities and business operations, emotional distress, and other damages in an amount to be proven at trial.

## VII. COUNT III

### VIOLATION OF 42 U.S.C. § 1981

#### *(Race Discrimination in the Making and Enforcement of Contracts)*

**75.** Plaintiffs reallege and incorporate paragraphs 1–53.

**76.** 42 U.S.C. § 1981(a) guarantees all persons in the United States the same right "to make and enforce contracts" as is enjoyed by white citizens. Under § 1981(b), "make and enforce contracts" includes the making, performance, modification, and termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

**77.** Plaintiffs are Black and therefore members of a protected class within the meaning of § 1981.

**78.** Plaintiffs entered into contractual banking and lending relationships with BIFCU, including the Loan and Security Agreement for Loan No. 53828, the Member Service Agreement governing their deposit accounts, and the account-service agreements and disclosures incorporated therein.

**79.** Plaintiffs performed under these contracts by making regular payments on the loan, maintaining deposit balances, and complying with the terms of their agreements through at least November 2025.

17

**80.** BIFCU impaired Plaintiffs' rights to make and enforce these contracts on equal terms by: (a) imposing an undisclosed ten-day lockout that froze Plaintiffs' accounts and debit cards well before the 21-day late-charge threshold disclosed in the loan agreement; (b) refusing to override the lock even when it prevented Plaintiffs from making payments to cure the delinquency; (c) freezing the deposit account of Premier Events Hawaii LLC, a separate legal entity that was not a party to the personal loan; (d) disabling the automatic payment transfer that BIFCU itself had established to service the loan; and (e) furnishing and then verifying inaccurate credit data, and continuing to furnish compounding inaccuracies in subsequent reporting cycles, after being placed on notice of Plaintiffs' dispute.

**81.** None of BIFCU's written agreements or consumer-facing disclosures inform members that a ten-day loan delinquency will trigger a non-discretionary lockout, and BIFCU has never produced to Plaintiffs any written policy, internal memorandum, or system documentation demonstrating that the ten-day lockout is a legitimate, uniformly applied business practice.

**82.** Plaintiffs' race was a but-for cause of BIFCU's decisions to enforce the undisclosed ten-day lockout against them, to freeze a separate business entity's account, to refuse to exercise the discretion afforded by the MSA's permissive language, to furnish and verify inaccurate credit data, and to subject Plaintiffs to treatment that was cumulatively harsher than any legitimate business justification would warrant.

**83.** By depriving Plaintiffs of the same rights to make and enforce contracts enjoyed by white citizens, BIFCU violated 42 U.S.C. § 1981.

**84.** As a direct and proximate result of BIFCU's § 1981 violations, Plaintiffs suffered actual damages including loss of access to funds, business disruption, emotional distress, harm to their

credit profiles, denial of a mortgage application, and compounding credit damage from continued inaccurate furnishing, in an amount to be proven at trial.

**85.** BIFCU's conduct was willful and in reckless disregard of Plaintiffs' federally protected rights, entitling Plaintiffs to compensatory and punitive damages, as well as costs of suit.

### VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

    **A.** Award actual damages according to proof;

    **B.** Award statutory and punitive damages under the FCRA, 15 U.S.C. §§ 1681n and 1681o;

    **C.** Award compensatory damages for Defendant's breach of the covenant of good faith and fair dealing under Hawai'i law;

    **D.** Award compensatory and punitive damages for Defendant's violations of 42 U.S.C. § 1981;

    **E.** Issue injunctive relief requiring BIFCU to: (i) conduct a reasonable reinvestigation of Plaintiffs' tradeline information; (ii) correct all inaccurate credit data furnished to consumer reporting agencies, including the inflated past-due amounts and derogatory ratings for December 2025 and January 2026; (iii) notify all consumer reporting agencies to which it furnished the inaccurate data of the corrections; and (iv) cease use of undisclosed automatic freeze practices that prevent borrowers from curing minor delinquencies;

    **F.** Award costs of suit and reasonable attorney's fees as permitted by law; and

**G.** Grant such other and further relief as the Court deems just and proper.

Dated: _2/17/26_

Respectfully submitted,

Michael Moore
Plaintiff, Pro Se
24 Pukihae St. Apt 223
Hilo, HI 96720
moore.michael14@gmail.com

Nomfusi Moore
Plaintiff, Pro Se
24 Pukihae St. Apt 223
Hilo, HI 96720
**nomfusimoore@gmail.com**

**Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

A. I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

DATED: 2 / 17 / 2 6

Michael Moore, Plaintiff Pro Se
24 Pukihae St, Apt 223
Hilo HI, 96720
moore.michael14@gmail.com
808-746-4601

Nomfusi Moore, Plaintiff Pro Se
24 Pukihae St. Apt 223
Hilo, HI 96720
nomfusimoore@gmail.com

21